UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AM TRUST,

        Plaintiff,

    v.

UBS AG,

        Defendant.

_____/

No. C 14-4125 PJH

**ORDER GRANTING MOTION TO DISMISS**

Defendant's motion for an order dismissing the above-entitled action for lack of personal jurisdiction came on for hearing before this court on January 21, 2015. Plaintiff appeared by its counsel Thomas Easton, and defendant appeared by its counsel Lauren Eber. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion as follows and for the reasons stated at the hearing.

**BACKGROUND**

Plaintiff AM Trust, the sole named plaintiff in this proposed class action, alleges that it is a Bahamian trust created by or for the heirs of Adam Malik ("Malik"), an Indonesian politician who served as Vice President of Indonesia under Suharto, and who was also the 26th President of the U.N. General Assembly. Malik died in September 1984. AM Trust's "settlor, trustees and beneficiaries" are allegedly the "heirs, assignees, creditors, and executors of the Estate of Adam Malik," none of whom are identified. See Cplt ¶¶ 17-18.

Defendant UBS AG has a 152-year history as a Swiss financial institution. See Declaration of Anne Wildhaber ¶ 3. The present-day UBS AG was formed in 1998, when Union Bank of Switzerland and Swiss Bank Corporation ("SBC") merged to form the new company. Id. Today, UBS AG is Switzerland's largest bank. Id. UBS AG is

1 incorporated, domiciled, and has its principal place of business and global headquarters in
2 Switzerland.  Id.  It operates under the Swiss Code of Obligations and Swiss Federal
3 Banking Act as an "Aktiengesellschaft" – or an "AG" – a corporation that issues shares of
4 common stock to investors.  Id.

5 UBS AG and its subsidiaries have offices in more than 50 countries, including the
6 United States.  Id. ¶ 4.  UBS AG maintains two branches in California – one in Los
7 Angeles, and one in San Francisco – as well as branches in Connecticut, Florida, Illinois,
8 and New York.  Id.  UBS AG also has several wholly owned direct and indirect subsidiaries
9 that operate in and/or are incorporated in the United States.  Id.

10 According to the complaint, Malik "obtained, came in possession or was assigned
11 several bank and safekeeping accounts" with UBS AG's predecessors.  Cplt ¶ 26.  The
12 accounts were allegedly "for [Malik's] personal use" and "contained well over five million
13 dollars in currency and gold bullion."  Id.  Other accounts were allegedly "assigned to Adam
14 Malik by Jusuf Muda Dalam, the former Director of the Indonesian Central Bank," under
15 undisclosed circumstances.  Cplt ¶ 27.  AM Trust asserts that "the accounts and their
16 contents are believed to be in compliance with Indonesian law of that time and were not the
17 proceeds of unlawful activity."  Cplt ¶ 28.

18 AM Trust alleges that "[i]n 1985 representatives of the Estate of Adam Malik made a
19 small, partial withdrawal" from "one or two" of the UBS accounts in Zurich, in the amount of
20 $2.9 million Swiss Francs, while the Estate was being settled.  Cplt ¶ 29.  AM Trust also
21 alleges that since 1985, "the Estate of Adam Malik has made continuous efforts to trace the
22 ultimate disposition of other SBC or Union Bank of Switzerland accounts in Switzerland and
23 Singapore" as well as to "access known accounts by hiring attorneys and investigators."
24 Cplt ¶ 31.  This search has allegedly been complicated "by the corruption endemic during
25 the Suharto regime in Indonesia."  Cplt ¶ 31.

26 AM Trust asserts that in 1993, the Estate of Adam Malik entered into extensive
27 correspondence with UBS AG's predecessor SBC and its lawyers "regarding SBC accounts
28 at the Basel, Breganzona, and Biningen branches that were tied to a Union Bank of

Switzerland account in Zurich that was controlled by Adam Malik." Cplt ¶ 32.[1] According to the complaint, SBC's Legal Department "eventually admitted" that while Malik had dealt directly with Ernest Siedel, Principal Director of Swiss Banking Corporation in Basel, no further record of "the accounts" could be located because 10 years had elapsed since the Basel account or accounts "were presumably closed." Id.

AM Trust asserts, however, that SBC "conducted only a partial search confined to its Basel branch even though the Estate had also identified Adam Malik accounts at Zurich, Breganzona, and Binningen connected to SBC." Id. AM Trust claims that "the Estate relying on SBC's false assurance did not realize at the time that SBC itself had converted the proceeds of the accounts and taht the records still existed and that the alleged search had not been conducted in good faith." Id.

AM Trust alleges that in 1997, a night bank guard at Union Bank of Switzerland, discovered that bank officials were destroying documents about dormant assets, believed to be the balances of deceased Jewish clients whose heirs' whereabouts were unknown, as well as books from the German Reichsbank, which listed stock accounts for companies in business during the Holocaust, and real-estate records for Berlin property that had been seized by the Nazis, placed in Swiss accounts, and then claimed to be owned by Union Bank of Switzerland. Cplt ¶ 33. The guard's whistleblowing allegedly led to the filing of class actions in federal court in New York, "a $1.25 [sic] settlement," several official reports, the release of records, and "the necessity for the promulgation of the 62 year statute of limitations law on dormant accounts in Switzerland." Cplt ¶ 33.

AM Trust alleges that in 2006, "with newly discovered documentation in hand" (not specified), "representatives of the Estate" traveled to Zurich to meet with representatives of UBS AG. A "quantity of information" was allegedly "handed over to UBS officers including information on the "merged Malik accounts." Cplt ¶ 35. However, in November 2006, UBS AG advised that there was no UBS AG account under the name Adam Malik, although

---

[1] Basel, Zurich, Breganzona, and Binningen are all cities located in Switzerland.

Union Bank of Switzerland had had an "account relationship that was closed in 1985." According to AM Trust, UBS AG "falsely stated that no records existed because 10 years had elapsed since the date of closure." Id.

AM Trust alleges that in 2007, the Estate made further inquiries about the accounts in Singapore and Hong Kong, but "did not receive a definitive answer from UBS AG," and that between 2007 and 2013, the Estate made additional attempts "through intermediaries and representatives," with no result. Cplt ¶¶ 36-37. In July 2013, the Swiss Banking Ombudsman Central Claims Office undertook a search of its centralized database, and in November 2013, the Office reported that no assets connected with Adam Malik had been reported to it as dormant, an opinion it reaffirmed in March 2014. Cplt ¶¶ 41-45.

AM Trust filed the present action on September 12, 2014, as a purported class action (on behalf of a "worldwide class"), and alleging diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). AM Trust asserts seven causes of action – (1) quasi-contract (unjust enrichment); (2) accounting; (3) restitution; (4) breach of fiduciary duty; (5) conversion; (6) constructive trust; and (7) trespass to chattel.

The complaint defines the proposed class as follows:

> Secret Bank Account Holders at UBS AG And its predecessors Swiss Banking Corporation (SBC) and Union Bank Switzerland who held an interest in secret bank accounts during the past 62 years (the current Swiss Statute of Limitations for dormant accounts) which were deliberately closed and converted by defendants without consent of the account holders and records destroyed, concealed, or withheld under the so called ten year rule when subsequent inquiries were initiated. The class *excludes*: certain beneficiaries of the Swiss Bank Holocaust settlements if their membership in the class is based solely on accounts for which they have already been compensated, all account holders who have previously relinquished or settled their claims, the Judge or Magistrate Judge to who [sic] this case is assigned and their families, all class members whose claim is solely based on accounts that have been reported to the Swiss Banking Ombudsman Dormant Account Database and who therefore have a remedy available and all class members who timely exclude themselves.

Cplt ¶ 47.

AM Trust claims it "has exhausted the limited remedy offered by the Swiss Banking Ombudsman Central Claims Office and UBS AG, and has reason to believe that because of the nature of this claim it cannot receive a fair trial in Switzerland and that [its] claim

4

would be rejected out of hand without remedy." Cplt ¶ 12.  AM Trust also asserts that "revelations about [Malik's] financial affairs and historical legacy would cause political repercussions in Indonesia thus rendering a fair trial impossible," and would "revive numerous false allegations and conspiracy theories involving the former rulers of Indonesia Suharto and Sukarno." Cplt ¶ 13.

## DISCUSSION

A.  Legal Standard

A district court sitting in diversity may exercise personal jurisdiction to the same extent as the courts of general jurisdiction of the state in which it is located.  See CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1073 (9th Cir. 2011).  Because California's long-arm statute is "coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." Id. (quotations and citations omitted); see also Cal. Code of Civ. Proc. § 410.10.  "It is well established that the Fourteenth Amendment's Due Process Clause limits the power of a state's courts to exercise jurisdiction over defendants who do not consent to jurisdiction." Martinez v. Aero Caribbean, 764 F.3d 1062, 1066 (9th Cir. 2014).

Absent one of the traditional bases for jurisdiction, constitutional due process requires that the defendant have certain "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  When a defendant deliberately engages in significant activities within a state, purposely availing itself of the privilege of doing business in that state, it is reasonable to require the defendant to "submit to the burdens of litigation in that forum as well."  Burger King v. Rudzewicz, 471 U.S. 462, 475-76 (1985).

Under the "minimum contacts" analysis, a court can exercise either "general or all-purpose jurisdiction," or "specific or conduct-linked jurisdiction." Daimler AG v. Bauman, 134 S. Ct. 746, 751 (2014) (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct 2846, 2851 (2011)); see Int'l Shoe, 326 U.S. at 316-20.  "Where a defendant moves to

dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004) (internal quotation marks omitted).

If the defendant's activities in the forum are "substantial, continuous, and systematic," general jurisdiction is available – the nonresident defendant will be subject to suit even on matters unrelated to his or her contacts with the forum. Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 446 (1952); see Daimler, 134 S.Ct. at 754-58.

Alternatively, a court may exercise specific jurisdiction over a defendant if his or her less substantial contacts with the forum gave rise to the claim or claims pending before the court – that is, if the cause of action "arises out of" or has a substantial connection with that activity. Hanson v. Denckla, 357 U.S. 235, 250-53 (1958); see Goodyear, 131 S.Ct. at 2854. The Ninth Circuit applies a three-part test to determine whether a defendant's contacts with the forum are sufficient to establish specific jurisdiction.

> (1) The nonresident defendant must do some act or consummate some transaction within the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. (2) The claim must be one that arises out or of results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable.

Gordy v. Daily News, L.P., 95 F.3d 829, 831-32 (9th Cir. 1996) (quoting Data Disc, Inc. v. Systems Tech. Assocs., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977)); see also Doe v. Unocal Corp., 248 F.3d 915, 923 (9th Cir. 2001).

B. Defendant's Motion

The gist of the complaint in the present action is that UBS AG holds assets that Malik's heirs are entitled to, that those heirs have been unable to access the assets or accounts due to lack of cooperation or other acts by UBS AG, and that UBS AG has misappropriated the funds for its own use, improperly closing the accounts or giving them "dormant" status.

UBS AG contends that it is difficult to ascertain from the complaint exactly what AM Trust is asserting, beyond the general description above. UBS AG also argues that the

6

complaint on its face identifies multiple factors that make information about the purported Malik accounts difficult to obtain, including the approximately 30 years that have passed since Malik's death; the mysterious circumstances surrounding the "assignment" of Swiss bank accounts from a political predecessor into Malik's name for his personal use; the absence of any allegation that any of Malik's heirs was ever named on any of the accounts as a signatory, successor in interest, or beneficiary; and the fact that UBS AG was not even formed until 14 years after Malik's death.

Nevertheless, UBS AG asserts, none of this matters, because the court does not have personal jurisdiction over UBS AG, and the entire action should be dismissed. UBS argues that under Daimler, a corporate defendant's "place of incorporation and principle place of business" are the only places where it is "fairly regarded as at home" and thus subject to jurisdiction for claims that arose outside the forum. Daimler, 134 S.Ct. at 760-61 & n.19; see also Martinez v. Aero Caribbean, 764 F.3d 1062, 1070 (9th Cir. 2014) (citing Daimler, 134 S.Ct. at 750-52, 760-61).

Because UBS AG's place of incorporation and principal place of business are located in Switzerland, UBS AG argues that it is not "at home" in California, and not subject to jurisdiction in California for claims unrelated to UBS AG's contacts with the forum. UBS AG asserts that Daimler clearly rejected the notion that a court should "look beyond the exemplar bases" identified by the Supreme Court in Goodyear, 131 S.Ct. at 2850-54, as limited to place of incorporation and principal place of business. See Daimler, 134 S.Ct. at 760.

UBS AG also contends that it is not subject to specific personal jurisdiction in connection with this case. As explained above, specific jurisdiction requires that the claim be one that arises out of or results from the defendant's forum-related activities. Here, UBS AG argues, there are no allegations in the complaint that UBS AG had any contacts with California (or even the United States) in connection with the alleged conduct giving rise to this action. The allegations involve UBS AG's handling of accounts in Switzerland (and possibly Singapore) belonging to an Indonesian national, and now benefitting his heirs,

7

through a Bahamian trust.

The only connection alleged to California is that "some members of the Account Holders class reside in California and this District." Cplt ¶ 9. UBS argues that such persons are purely hypothetical, and that in any event, where the purported class members reside is irrelevant to the specific jurisdiction analysis, because the class allegations concern UBS AG's handling of accounts in Switzerland.

In opposition, AM Trust asserts that the court has general jurisdiction and specific jurisdiction, and that by operating banks in the U.S., UBS AG has "consented" to jurisdiction. First, AM Trust argues that the court has general personal jurisdiction because UBS AG is regulated by the International Banking Act ("IBA"), which AM Trust asserts applies federal banking laws to U.S. branches of foreign banks.

The International Banking Act of 1978 ("IBA"), 12 U.S.C. §§ 3101–3108, is the principal federal law governing foreign bank operations. See United States v. Lewis, 67 F.3d 225, 230 (9th Cir. 1995) (citation omitted). Until the enactment of the IBA, foreign banks operating branches in the United States did so only under state authority. Id. at 231 (citation omitted). Under the IBA, a branch of a foreign bank must choose between state and federal treatment, and, subject to the approval of the Comptroller of the Currency, a foreign bank may establish either a "federal branch" or a "federal agency" in any state in which it is not operating a branch under state law, and in which the establishment of such branch is not prohibited by state law. Id. (citing 12 U.S.C. § 3102(a)(1)). AM Trust argues that pursuant to 12 U.S.C. § 3106a, UBS became a "domesticated federal and/or state bank" by virtue of being regulated by the Federal Reserve, the Office of the Comptroller of the Currency, and the state banking regulator.

AM Trust also contends that the court has specific jurisdiction in California. AM Trust asserts that in operating two branches in California, UBS has purposely availed itself of the privilege of conducting activities in the forum. As for UBS AG's contention that its California activities at the two branches have no relationship to the complaint in the present action, AM Trust responds that

8

> UBS AG and its predecessors embarked on a long time policy of corrupt banking practices aimed at a vulnerable subset of secret bank account holders, including United States citizens in California who held Swiss bank accounts through UBS AG and its predecessors' cross-border entities and are estimated to number over 1000 persons and entities who make up a portion of the worldwide class who have been deprived of their accounts through the actions of UBS AG.

Opp. at 9-10.

AM Trust contends that "[g]iven the troubled history of secret banking and Swiss banking in particular, it is not only plausible but probable that UBS AG's California branches in San Francisco and Los Angeles catered to a wealthy clientele like Adam Malik interested in opening undeclared, secret and low denomination accounts." Opp. at 10.

AM Trust asserts further that under the Edge Act, 12 U.S.C. § 632, the presence of UBS AG's branches in California essentially amounts to UBS AG "consenting to" jurisdiction in this forum. The Edge Act provides, in part, that

> all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, . . . shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; . . . .

12 U.S.C. § 632.

AM Trust argues that UBS AG's "federally chartered branches" (apparently a reference to the IBA argument above) can be considered "any corporation organized under the laws of the United States" if they have what AM Trust calls a "dual identity." AM Trust adds, "Likewise, some of UBS AG's other subsidiaries are organized under the laws of the United States. Therefore UBS AG has acquired a dual nationality by consenting to operate under US banking laws." Opp. at 11-12.

Finally, AM Trust contends that because the nature of UBS AG's contacts and "cross border banking operations" in California are "not fully elucidated by the pleadings before the [c]ourt," and because UBS' contacts with the U.S. are "quite complex and at times controversial," the court "could benefit from jurisdictional discovery." AM Trust also argues that if the court "is in doubt as to the class allegations in particular and their relationship to

9

this jurisdiction," discovery would be appropriate. Opp. at 12-13.

In particular, AM Trust asserts, it wants jurisdictional discovery regarding UBS AG's

> branch banking, cross border operations, wealth management and other operations in California as well as the United States to determine if UBS AG has acquired a dual US banking nationality and therefore is either 'at home' in California and/or meets the criteria for specific jurisdiction and/or has intentionally or unintentionally consented to jurisdiction by operating under US statutes such as the IBA and Edge Act.

Opp. at 12. According to AM Trust, the materials it would seek would include "filings with the Federal Reserve and the Comptroller of the Currency." Opp. at 12-13.

The court finds that the motion to dismiss must be GRANTED. First, under Daimler, UBS AG is not subject to general jurisdiction in this District (or anywhere in the United States) because it is incorporated in Switzerland and its principal place of business is in Switzerland. AM Trust's argument that UBS AG is subject to general jurisdiction because it is regulated by the IBA, which applies federal banking law to U.S. branches of foreign banks, amounts to saying that a foreign corporation is subject to general personal jurisdiction in the U.S. simply because U.S. operations are governed by U.S. law. As UBS AG notes, if this were the standard, every foreign corporation would be subject to general jurisdiction in the U.S., since every corporation operating in the U.S. is subject to some extent to U.S. laws. Nothing in the IBA causes UBS AG's branches to be "at home" in the U.S. rather than in Switzerland, where UBS AG is incorporated and headquartered.

It is true that the IBA requires that "a foreign bank shall conduct its operations in the United States in full compliance with provisions of" certain laws that apply to U.S. banks," 12 U.S.C. § 3106a, but nothing in any provision of the IBA changes the foreign character of a U.S. branch of a foreign bank. Indeed, § 3106a refers to "foreign banks" and their "operations in the United States" as distinct from "national banks" or "State-chartered banks."

The IBA defines a "foreign bank" as "any company organized under the laws of a foreign country . . . which engages in the business of banking . . ." and clarifies that the term "foreign bank" includes various "foreign institutions that engage in banking activities

10

usual in connection with the business of banking in the countries where such foreign institutions are organized or operating[.]" 12 U.S.C. § 3101(7). A "federal branch" is "a branch of a foreign bank established and operating under section 3102 of this title." 12 U.S.C. § 3101(6). These definitions make clear that a branch of a foreign bank operating in the United States is foreign in character. The fact that the foreign bank has to comply with U.S. banking regulations does not change the fact that the foreign bank remains "at home" in its place of incorporation and principal place of business.

Under the IBA, a branch of a foreign bank must choose between federal and state treatment, and can expect thereafter to be subject to the same restrictions as a similarly situated domestic bank. See 12 U.S.C. §§ 3101-3102; Lewis, 67 F.3d at 230-01. When a U.S. branch of a foreign bank registers with the federal government, pursuant to § 3102, it is called a "federal branch" (meaning it is registered with federal, as opposed to state, authorities). However, U.S.-based branches of foreign banks are entirely distinct from national banks or state banks, which are "domestic banks" chartered and regulated by the United States or a state.

As shown by documents attached to UBS AG's Request for Judicial Notice and supporting declaration, its branches in the United States are registered with the OCC as federal branches (rather than as state branches). The attached report entitled "National Banks and Federal Branches and Agencies as of 10/31/2014," shows that UBS AG has Federal branches in Miami, New York, Los Angeles, San Francisco, and Tampa, and that all list "Switzerland" as their "home country."

Under the applicable regulations, a foreign bank's "home country" is "the country in which the foreign bank is chartered or incorporated." 12 C.F.R. § 211.21(p). Moreover, the IBA requires oversight of the foreign bank by a "home country supervisor" which is defined as "the governmental entity or entities in the foreign bank's home country with responsibility for supervision and regulation of the foreign bank." 12 C.F.R. § 211.21(q). In other words, the IBA recognizes that a foreign bank with a federal branch (such as UBS AG) retains its foreign character and is incorporated in a foreign country (and, indeed, imposes the

11

requirement that the foreign bank be subject to government oversight by its home country).

Adherence to the IBA does not result in the conversion of a federal branch of a foreign bank into an entity that is "at home" in the United States. The only relevant considerations for purposes of determining general jurisdiction are place of incorporation and principal place of business, which in the case of UBS AG is Switzerland.

Second, UBS AG is not subject to specific jurisdiction, as AM Trust's claims do not arise out of any of UBS AG's contacts with the forum. AM Trust's assertion that the court has specific jurisdiction appears to be based on the theory that the claims that will be asserted by the proposed class members once the class is certified arise out of UBS AG's contacts with California. However, claims of unnamed class members are irrelevant to the question of specific jurisdiction. See, e.g., Ambriz v. Coca Cola Co., 2014 WL 296159 at *4-6 (N.D. Cal. Jan. 27, 2014).

Third, UBS AG has not consented to jurisdiction in this forum via operation of the Edge Act (or otherwise). The Edge Act allows national banks (i.e., United States banks) to engage in international banking through federally-chartered subsidiaries. See 12 U.S.C. § 601 et seq. Thus, it addresses the issue of U.S. banks engaged in international banking, rather than (as here) international banks engaging in U.S. banking. Moreover, the provision cited by AM Trust (§ 632) relates to subject matter jurisdiction, not to personal jurisdiction or consent thereto – and, it applies to corporations "organized under the laws of the United States," not to corporations organized under the laws of foreign countries.

AM Trust's contention that UBS AG, while a Swiss company, is also organized under the laws of the United States, makes no sense. It is undisputed that UBS AG is a organized as an Aktiengesellschaft under the Swiss Code of Obligations and Swiss Federal Banking Act. Daimler does not contemplate that a company can be found to be organized under the laws of the United States by virtue of operating branches or subsidiaries there. Rather, personal jurisdiction of a corporation is based solely on the place of incorporation and principal place of business.

Finally, the court finds that jurisdictional discovery is unnecessary and inappropriate,

12

as it would not reveal facts sufficient to constitute a basis for jurisdiction. Indeed, Daimler directly addressed the impact of its decision on the need for jurisdictional discovery, stating that "it is hard to see why much in the way of discovery would be needed to determine whether a corporation is at home." Daimler, 134 S.Ct. at 762 n.20.

AM Trust's explanation of what it would seek through jurisdictional discovery confirms that none of the proposed discovery has any relevance to the applicable jurisdictional inquiry. In particular, AM Trust says it needs discovery to "determine if UBS AG has acquired a dual banking nationality." However, the Daimler Court rejected the argument that general jurisdiction is appropriate whenever a corporation engages in a "substantial, continuous, and systemic course of conduct – and clearly found that the only relevant facts for determining whether a corporation is "at home" are its place of incorporation and its principal place of business.

## CONCLUSION

In accordance with the foregoing, the complaint is DISMISSED. The dismissal is WITH PREJUDICE. Under Daimler, there is no general jurisdiction in this court over a bank that is incorporated and has its principal place of business in Switzerland. As for specific jurisdiction, the claims asserted by AM Trust have no connection to the United States, let alone this forum. The only accounts opened by or for Malik that are referenced in the complaint were located in Switzerland or possibly Singapore. There are no allegations showing that "but for" UBS AG's contacts with California, AM Trust's cause of action would not have arisen. See Omeluk v. Langsten Slip & Bathyggeri A/S, 52 F.3d 267, 271 (9th Cir. 1995).

Moreover, the claims of the unnamed class members are irrelevant to the specific jurisdiction analysis. It is settled that venue and personal jurisdiction requirements to suit "must be satisfied for each and every named plaintiff for the suit to go forward." Abrams Shell v. Shell Oil Co., 165 F.Supp. 2d 1096, 1107 n.5 (C.D. Cal. 2001) (citing cases); see also Blair v. CBE Group, Inc., 2013 WL 2029155 at *2 (S.D. Cal. May 13, 2013).

Finally, as for jurisdictional discovery, there is no dispute that UBS AG is a Swiss

13

Aktiengesellschaft, incorporated in Switzerland and having its principal place of business there. Nothing that discovery might reveal that will change that fact. AM Trust by its own admission is a Bahamian trust with Indonesian beneficiaries, asserting a claim that UBS converted and concealed assets in accounts in Switzerland and possibly Singapore. AM Trust has not brought any claim on its own behalf arising from UBS AG's contacts with the Northern District of California. There is no specific jurisdiction, and discovery in that regard would be nothing but a fishing expedition.

**IT IS SO ORDERED.**

Dated: January 29, 2015.

PHYLLIS J. HAMILTON
United States District Judge